Edward W. Floyd, Esq.
EATON & VAN WINKLE LLP
3 Park Avenue
New York, New York 10016
212.779.9910
efloyd@evw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| POLISH STEAMSHIP COMPANY, and POLSTEAM SHIPPING COMPANY<br><br>Plaintiffs,<br><br>-against-<br><br>NOVEL COMMODITIES S.A.<br><br>Defendant. | Civil Action No. _____<br><br>**VERIFIED COMPLAINT IN ADMIRALTY & PRAYER FOR ATTACHMENT UNDER RULE B OF THE SUPPLEMENTAL RULES FOR ADMIRALTY OR MARITIME CLAIMS** |

Plaintiffs, Polish Steamship Company ("Polish Steamship") and Polsteam Shipping Company ("Polsteam") (collectively "Plaintiffs"), by their attorneys, Eaton & Van Winkle LLP, for their Verified Complaint against defendant, Novel Commodities S.A. ("Defendant" or "Novel"), state, on information and belief, as follows:

1. This is a case of admiralty and maritime jurisdiction, 28 U.S.C. 1333, and is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and Rule B of the Supplemental Rules for Admiralty or Maritime Claims.

**Parties**

2. Plaintiffs are foreign corporations or other business entities existing under the laws of, and with places of business in, foreign countries.

1

3. Defendant is a foreign corporation or other business entity existing under the laws of, and with a place of business in, a foreign country.

## Summary of Claim

4. As is further described below, Plaintiffs' claims against Novel arise from Novel's breach of its obligations under two, interrelated maritime contracts.

5. The first contract was a voyage charter party between Polsteam (as owner) and Novel (as charterer).

6. Novel has breached the charter party by, *inter alia*, failing to pay outstanding demurrage in the amount of, at least, $805,715.34.

7. The second contract was a Letter of Indemnity which Novel provided to Polsteam and Polish Steamship in order to cause them to discharge cargo into the custody of Novel's agents. The Letter of Indemnity obligated Novel to, *inter alia*, indemnify and hold harmless Plaintiffs for any losses, damages and/or claims relating to the Plaintiffs' discharge of the concerned cargo. The Letter of Indemnity also obligated Novel to, *inter alia*, provide Plaintiffs, on demand, with sufficient funds to secure the release of any vessels in the Plaintiffs' fleet which might be arrested or otherwise restrained in connection with claims arising from Plaintiffs' discharge of the concerned cargo.

8. Novel has breached the Letter of Indemnity (a) by failing to indemnify and hold harmless Plaintiffs from losses, damages and claims relating to Plaintiffs' discharge of the cargo and (b) by failing to provide Plaintiffs with any funds to secure the release of a vessel which was arrested in connection with claims arising from Plaintiffs' discharge of the cargo.

## Underlying Events

9. On or about May 29, 2012, Polsteam (as disponent owners of the MV OLZA [the

2

"OLZA"]) entered into a voyage charter with Novel for the OLZA to carry 15,000 metric tons of bagged rice from certain Asian ports to certain African ports (the "Charterparty"). 10,000 metric tons of rice were to be loaded in Thailand for discharge in Mauritania. 5,000 metric tons were to be loaded in India for discharge in Liberia.  The Charterparty is subject to English law and London Arbitration.  (A copy of the Charterparty is annexed hereto as Exhibit A.)

10. On or about June 17, 2012, 10,000 MTs of cargo were loaded in Thailand and bills of lading were issued with respect to the same.  (The cargo loaded in India is not relevant to the present dispute.)

11. On or about September 5, 2012, the vessel arrived at a Mauritanian port. Significant delays involving issues between Novel and the cargo receivers ensued, but the vessel eventually delivered 4,000 MTs to the cargo receivers, Societe ACODIS ("ACODIS").  That delivery was made, without production of the original bills of lading, pursuant to Novel's instructions.  Thereafter, on or about November 27, 2012, Novel ordered the vessel to depart Mauritania and to proceed to Dakar, Senegal.

12. Prior to or at about the time that the vessel arrived at Dakar, a dispute arose between Novel and ACODIS regarding ACODIS's payment or non-payment for the remaining cargo.  As such, on or about December 28, 2012, the vessel's master received an order, dated December 21, 2012, from the Regional Exceptional Tribunal of Dakar providing for the protective seizure by Novel of the cargo remaining on board as security for ACODIS's alleged debts in an amount equal to approximately US$3.3 million (the "December 21 Dakar Order"). That order provided for the cargo to be immediately delivered into Novel's custody in Dakar.

13. On or about January 3, 2013, Novel provided Plaintiffs with a Letter of Indemnity (the "LOI") which instructed Plaintiffs to deliver the remaining cargo into the custody of Novel's

agents in Dakar in accordance with the December 21 Dakar Order.

    14.    The LOI provided, in pertinent part, that "in consideration of [Plaintiffs'] complying" with Novel's request for discharge of the cargo, Novel agreed, *inter alia*:

    a.  To indemnify and hold harmless Plaintiffs "in respect of any liability, loss, damage or expense of whatsoever nature which [Plaintiffs] may sustain by reason of delivering the cargo in accordance" with Novel's request;

    b.  "In the event of any proceedings being commenced against [Plaintiffs] in connection with the delivery of the cargo . . . to provide [Plaintiffs] on demand with sufficient funds to defend the same"; and

    c.  "If in connection with the delivery of the cargo as aforesaid, the ship or any other ship or property in the same or associated ownership, management or control, should be arrested or detained or should the arrest or detention thereof be threatened, or should there be any interference in the use or trading of the vessel (whether by virtue of a caveat being entered on the ship's registry or otherwise howsoever), to provide on demand such bail or other security as may be required to prevent such arrest or detention or to secure the release of such ship or property or to remove such interference and to indemnify [Plaintiffs] in respect of any liability, loss, damage or expense caused by such arrest or detention or threatened arrest or detention or such interference, whether or not such arrest or detention or threatened arrest or detention or such interference may be justified."

    15.    The LOI further provided that it would be governed by English law with any disputes thereunder to be resolved in the High Court of Justice of England.  (A copy of the LOI is annexed hereto as Exhibit B.)

16. Relying upon the terms of the LOI, the Plaintiffs discharged the cargo pursuant to Novel's instructions.

17. However, shortly before completion of discharge, the vessel's master was provided with an order, dated January 11, 2013, from the Tribunal Régional Hors Classe de Dakar in proceedings between ACODIS and Novel (the "January 11 Dakar Order"). The January 11 Dakar Order purported to set aside the December 21 Dakar Order but, by the time the January 11 Dakar Order was served, a substantial majority of cargo had already been discharged and discharge was completed soon thereafter.

18. ACODIS then proceeded to seek security in the amount of $9,000,000 from Polsteam for the alleged failure of the OLZA to discharge all of the concerned cargo to ACODIS in Mauritania.

19. ACODIS sought such security by applying, on or about March 15, 2013, to a court in Morocco for an order to arrest a vessel (the MV NOGAT or the "NOGAT") which ACODIS alleged to be under the same ownership as the OLZA (i.e., an alleged sister-sister). The Moroccan court granted that application and the NOGAT was then arrested in Morocco where it remained, at anchor, subject to the arrest order until May 3, 2013 when it was released upon the posting of a Letter of Undertaking by Plaintiffs' Protection & Indemnity Club.

20. Prior to that release, Plaintiffs made written demand for Novel to perform its obligations under the LOI, and to thereby immediately provide the bail or other security necessary to enable release of the NOGAT from the terms of the arrest order, stating that "a security guarantee in the sum of US$9,000,000 is required to allow the lifting of the arrest." Plaintiffs written demands also put Novel on notice that Plaintiffs shall look to Novel to indemnify and hold them harmless from any liability, loss, damage or expense of whatsoever

nature sustained by reason of the NOGAT's arrest. (A copy of Plaintiffs' demand, dated March 20, 2013, is annexed hereto, in pertinent part, as Exhibit C.)

21. Despite Plaintiffs' due demand and Novel's clear contractual obligations under the LOI, Novel failed to provide bail or other security to enable the NOGAT's release and has otherwise breached its obligations causing Plaintiffs to suffer damages in an amount which continues to increase and equals, at least, $121,926.81 (for the costs caused by the arrest) plus $9 million (for Novel's failure, in breach of the LOI, to provide bail or other security for the NOGAT's release).

22. Plaintiffs have accordingly commenced litigation in an English court concerning their claims under the LOI. In the English court proceedings, Novel has conceded its obligation to indemnify Plaintiffs in an amount to be assessed. Plaintiffs have also commenced arbitral proceedings in London concerning their claims under the Charterparty.

### FIRST CAUSE OF ACTION

23. Paragraphs 1 through 22 are repeated and realleged as is fully set forth herein.

24. Novel has failed to pay outstanding demurrage due to Polsteam under the Charterparty and is thereby in breach of the same.

25. Novel's breach of the Charterparty has caused Polsteam to suffer damages which continue to increase and are currently equal to, at least, $805,715.34.

### SECOND CAUSE OF ACTION

26. Paragraphs 1 through 25 are repeated and realleged as is fully set forth herein.

27. Novel failed to provide bail or other security necessary to enable the release of the NOGAT from arrest as Novel was obligated to do under the LOI, has otherwise failed to perform its obligations under the LOI, and is thereby in breach of the same.

28. Novel's breach of the LOI has caused Plaintiffs to suffer damages which continue to increase and are equal to, at least, $121,926.81 (for the costs caused by the arrest) plus $9 million (for Novel's failure to provide bail or other security for the NOGAT's release).

## RULE B ATTACHMENT

29. The Charterparty provides that disputes arising thereunder are to be resolved by arbitration in London pursuant to English law. The LOI provides that disputes arising thereunder are to be resolved by the High Court of England pursuant to English law.

30. This action is brought to obtain jurisdiction over Novel in this District and to obtain security in favor of Plaintiffs in respect of their claims against Novel and in aid of legal proceedings in England.

31. This action is also brought to obtain security for additional sums to cover Plaintiffs' anticipated costs in English legal proceedings, all of which are recoverable under English law.

32. Upon information and belief, and after investigation, Novel cannot be found within this District for the purposes of Rule B of the Supplemental Rules for Admiralty or Maritime Claims, but Plaintiffs are informed that Novel has, or will shortly have, property subject to attachment within this District.

33. Specifically, Plaintiffs have reviewed documents, filed in cases captioned as *Novel Commodities S.A. v. QBE Insurance Corp.* (S.D.N.Y. Docket No. 11 cv 6339) and *Global Commodities Group, LLC v. National Union Fire Insurance Company of Pittsburgh, PA* (S.D.N.Y. Docket No. 13 cv 2063) which reflect that Novel has, on information and belief, financial or commercial dealings with business entities located in this District, including:

   a. Access Global Capital LLC, located at 8 Old Clinton Road, Lebanon, NJ 08833,

which obtained, on behalf of Novel, a trade credit insurance policy (issued by QBE Insurance Corp.) and which entered, together with Novel as a co-insured, into another trade credit insurance policy (issued by Union National Fire Insurance Company); and

b. Global Commodities Group, LLC, located at the same address, which has entered into commodities sales transactions with Novel.

34. The total amount sought to be attached pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims by Plaintiffs against Novel includes: (i) the principal claim in the amount of $9,927,642.15; (ii) interest on the demurrage claim in the estimated amount of, at least, $80,000.00 as estimated will accrue during the time necessary to obtain a London arbitral award (plus interest as assessed on the LOI claims); and (iii) estimated attorney's fees and disbursements, together with the costs of the London proceedings, including arbitrators fees, all of which are recoverable in the English court and arbitration proceedings, in the estimated amount of $1,500,00.00, for a total claim of, at least, $11,507,642.15.

**RESERVATION OF RIGHT TO HAVE UNDERLYING MERITS OF DISPUTE RESOLVED PURSUANT TO CONTRACTUALLY DESIGNATED FORA AND LAW**

35. As described above, the underlying contractual documents provide for disputes arising thereunder to be arbitrated (the Charterparty) or litigated (the LOI) in London pursuant to English law.

36. Plaintiff expressly reserves the right to have the underlying merits of this dispute resolved in England, pursuant to English law, by arbitration (as to the claims under the Charterparty) and by litigation in the English High Court (as to claims under the LOI), and

brings this action solely to obtain quasi-in-rem jurisdiction and security for its damages, interest and the costs of the London proceedings.

WHEREFORE, Plaintiffs prays as follows;

a.  That process in due form of law according to the practice of this Court may issue against Novel;

b.  That the Court, in accordance with the provisions of Rule B of the Supplemental Rules for Admiralty or Maritime Claims, direct the issuance of Process of Maritime Attachment and Garnishment attaching all assets within the District owned by Novel or in which Novel has a beneficial or otherwise attachable interest up to the amount of $11,507,642.15;

c.  That judgment be entered against Novel and in favor of Plaintiffs in the amount of, at least, $11,507,642.15, plus interest, costs, and attorney's fees; and

d.  That the Court grant such other, further and different relief as may be just, proper and equitable in the premises.

Dated:  New York, New York
        May 16, 2013

                                            EATON & VAN WINKLE LLP

                            By:    /s/ Edward W. Floyd
                                    Edward W. Floyd
                                    3 Park Avenue
                                    New York, New York 10016-2078
                                    (212) 779-9910

                                    *Attorneys for Plaintiffs*

## **VERIFICATION**

Edward W. Floyd, pursuant to the provisions of 28 U.S.C. § 1746, declares and states as follows:

1. I am an attorney admitted to practice before this Court and am a partner with the firm of Eaton & Van Winkle LLP, attorneys for Plaintiffs, and I make this verification on behalf of Plaintiffs.

2. I have read the foregoing complaint and know the contents thereof and the same are true to the best of my knowledge, information and belief.  The sources of my information and the grounds for my belief are communications received from the Plaintiffs and the London solicitors for Plaintiffs and an examination of the papers relating to the matters in suit.

3. The reason this verification is made by the undersigned, and not made by Plaintiffs, is that Plaintiffs are foreign corporations or other business entities, no officer or director of which is presently within this District.  I am authorized to make this verification.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
      May 16, 2013

                                          /s/ Edward W. Floyd
                                          Edward W. Floyd

# DECLARATION IN SUPPORT OF AN ORDER APPOINTING
# A PERSON TO SERVE PROCESS

Edward W. Floyd, pursuant to the provisions of 28 U.S.C. §1746, declares and states as follows:

1. I am an attorney admitted to practice before this Court and am a partner with the firm of Eaton & Van Winkle LLP, attorneys for Plaintiffs.

**Efforts to Find the Defendant in New Jersey for Purposes of Rule B**

2. To the best of my information and belief, the Defendant cannot be found within this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims.

3. I caused a search to be made for the Defendant by going to the State of New Jersey, Division of Revenue and Enterprise Services, Business Records Service's online database and searching therein for Defendant. This database contained no record of the Defendant having a presence in New Jersey.

4. I also searched the online white pages for the Defendant and did not find a listing for the Defendant.

5. I am also unaware of any general or managing agents within this District for Defendant.

6. For the foregoing reasons, I submit that the Defendant cannot be found in this District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Claims.

**Appointment of Persons to Serve Process of Maritime Attachment and Garnishment**

7. I also make this Declaration in support of Plaintiffs' application, pursuant to the provisions of Rule 4(c) of the Federal Rules of Civil Procedure and the provisions of Rule

B(1)(d)(ii) of the Supplemental Rules for Admiralty or Maritime Claims, for an Order appointing Edward W. Floyd or any other partner, associate, paralegal or agent of Eaton & Van Winkle LLP (including professional process servers engaged by Plaintiffs' counsel), in addition to the United States Marshal, to serve Process of Maritime Attachment and Garnishment on the garnishees listed in the Process, together with other possible garnishees.

8.     The partners, associates, paralegals or agents of Eaton & Van Winkle LLP (including professional process servers engaged by Plaintiffs' counsel), who will be designated, are over 18 years of age, and are not a party to this action.

9.     Plaintiffs desire to serve the Process of Maritime Attachment and Garnishment on the garnishees promptly so that Plaintiffs will be fully protected against the possibility of not being able to satisfy any arbitral award and/or judgment that may be obtained by Plaintiffs against Defendant.

10.    Plaintiffs respectfully request, for the foregoing reasons, that the Court appoint Edward W. Floyd or any partner, associate, paralegal or agent of Eaton & Van Winkle LLP to serve the Process of Maritime Attachment and Garnishment upon the garnishees listed in the Process, together with any other garnishees that Plaintiffs learn may hold assets of Defendant.

11.    No previous application for this or similar relief has been made in this Court.  It is noted for thoroughness though that Plaintiffs have commenced a similar Rule B proceeding in the United States District Court for the Southern District of New York, under Docket Number 13-cv-2435 (WHP) (the "New York Proceedings").  Additionally, in the New York Proceedings, the court authorized issuance of process of maritime attachment and garnishment, and appointed persons to serve that process, on April 12, 2013.

12.    In light of the foregoing, it is respectfully requested, on behalf of Plaintiffs, that

the Court execute the accompanying (Proposed Form of) Order for Issuance of Process of Maritime Attachment and Garnishment and Appointing Person to Serve Process.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       May 16, 2013

                                                            /s/ Edward W. Floyd
                                                            Edward W. Floyd